899 So.2d 765 (2005)
Joyce H. BOYTE, Plaintiff-Appellee
v.
LOUISIANA AG CREDIT, PCA, Defendant-Appellant.
No. 39,569-CA.
Court of Appeal of Louisiana, Second Circuit.
April 6, 2005.
*766 Wiener, Weiss & Madison By M. Allyn Stroud, Shreveport, for Appellant.
John M. Lancaster, for Appellee.
Before STEWART, GASKINS and CARAWAY, JJ.
STEWART, J.
The plaintiff, Joyce Boyte, filed suit against the defendant, Louisiana Ag Credit, PCA ("PCA"), to recover input costs she had loaned to her brother, Charles L. Hayman, for planting his 2001 sweet potato crop on 35 acres of land owned by Boyte. Boyte's claim against PCA was based on a Forbearance Agreement between PCA, Hayman's creditor, and Hayman, acknowledging Boyte's "first lien" on the sweet potatoes planted on her 35 acres. The trial court found that Boyte was a third party beneficiary of the Forbearance Agreement and awarded her $12,987.54. PCA appealed. Finding that the Forbearance Agreement includes a stipulation pour autrui in favor of Boyte, we affirm the trial court's judgment.

FACTS
In the Spring of 2001, as in prior years, Charles Hayman entered a verbal agreement with his sister, Joyce Boyte, to lease 35 acres of land for farming, with one-fourth of the proceeds from the crop to be paid as rent. Because Hayman was having financial difficulties in 2001, Boyte also loaned him money for planting the crop on her 35 acres. This was the first time that Boyte had advanced input costs to Hayman for the crop.
As the planting season progressed, Hayman was negotiating with PCA, to whom he was indebted for a significant sum of money, to prevent foreclosure and to obtain financing for the 2001 crop. The negotiations resulted in a Forbearance Agreement confected on August 9, 2001, between Hayman and PCA. The agreement extended Hayman's indebtedness and set forth terms and conditions that Hayman would have to comply with to avoid foreclosure. Included in the agreement was the following language:
9. Debtors shall grant the Association [PCA] a first lien on the 2001 sweet potato crop. The Association acknowledges that Mrs. Boyte holds a first lien on 35 acres of the sweet potatoes planted on Mrs. Boyte's property. The Association will execute a non-disturbance agreement in favor of Mrs. Boyte for the 2001 sweet potato crop up to the amount of Mrs. Boyte's input costs, projected by the Debtors to be $27,926.66.
Upon entering this agreement, PCA loaned Hayman additional sums to complete his 2001 sweet potato crop, which included acreage in addition to that leased from Mrs. Boyte. We note that at the time of the Forbearance Agreement, PCA held an apparently valid security interest over all of Hayman's crops, growing or to be grown and harvested, as evidenced by a security agreement and a UCC-1F filed in *767 the Secretary of State's Central Registry in March 2000 and admitted into evidence at trial.
From the sale of Hayman's 2001 sweet potato crop, Boyte received one-fourth of the proceeds generated by the crop planted on her 35 acres as rental payment. The remaining three-fourths of the proceeds from the crop on Boyte's acreage was paid by the crop broker, Gerber Farms, to PCA because of its lien. When Mrs. Boyte did not recover all the input costs advanced to Hayman, she demanded reimbursement from PCA by letter on October 4, 2002. PCA refused reimbursement.
On June 19, 2003, Boyte filed suit against PCA to recover her input costs in the amount of $12,987.54. She alleged that she had a "first lien" acknowledged by PCA and that PCA had not reimbursed her costs from the crop proceeds. During a bench trial, Boyte's husband, Clevius Cecil Boyte, and PCA's chief credit officer, Leotis Hyde, Jr., testified.
Mr. Boyte testified as to the facts regarding Hayman's lease of the 35 acres and the input costs advanced by the Boytes. The parties stipulated that Mrs. Boyte's testimony would be the same as her husband's. Mr. Boyte explained that his wife had an oral agreement with Hayman providing that the input costs and rental would be paid when the crop was sold. The Boytes began contributing input costs in May 2001, but they paid nothing more after Hayman entered the Forbearance Agreement with PCA. On August 20, 2001, Mrs. Boyte and Hayman signed a written lease, but it was not recorded and did not refer to the input costs. Mr. Boyte also testified that neither he nor his wife had any contact with PCA or any part in negotiating the Forbearance Agreement. When asked what he thought Paragraph 9 of the agreement meant, he testified that it meant his wife had a first lien and that she would be reimbursed for rent and input costs ahead of other lenders.
Mr. Hyde testified that PCA was trying to find a way to avoid foreclosure on Hayman and to fund a crop loan for him. PCA initially denied Hayman's request for a 2001 crop loan, but later loaned him money after entering the Forbearance Agreement. Mr. Hyde explained that he and PCA's attorney drafted the agreement and that their objective was for PCA to have a valid first lien on all of Hayman's crops. Additionally, Hyde testified that PCA never agreed to reimburse Boyte's production costs or to have those costs reimbursed to Boyte out of the crop proceeds. Hyde insisted that if PCA intended to reimburse Boyte's costs, it would have done so at the time of the Forbearance Agreement. Moreover, Hyde testified that PCA did not grant Boyte a first lien in the Forbearance Agreement. He repeatedly insisted that Paragraph 9's reference to Boyte's first lien was merely intended to protect her by allowing her to recover her input costs in the event that PCA foreclosed on Hayman and seized all the crops. Hyde explained that in the absence of foreclosure, Boyte would get her rental payment from the sale of the crop and that Hayman could reimburse her input costs from any funds left over after he met his obligation to PCA under the Forbearance Agreement. However, if PCA foreclosed and took the crop, it wanted to be sure that Boyte received her input costs. Hyde also explained that the language of Paragraph 9 suggested foreclosure even though foreclosure was not expressly stated.
Three letters from June 2001 between counsel for PCA and counsel for Hayman were introduced into the record. The letters were part of the negotiations leading up to the Forbearance Agreement. Hyde testified that he was aware of the contents *768 of the letters and that he had discussed the matter with PCA's attorney. Hyde testified that negotiations leading up to the Forbearance Agreement with Hayman continued until the signing of the agreement.
In the first letter dated June 8, 2001, Hayman's attorney informed PCA that Hayman planted sweet potatoes on Mrs. Boyte's 35 acres and that Mrs. Boyte agreed to underwrite the expenses for planting the crop on her acreage. The letter indicated that Hayman did not have funds to plant additional acreage but that he was willing to sell certain bushel bins and use the proceeds to plant additional acreage over which PCA would be given a first lien.
In the second letter dated June 14, 2001, PCA set forth conditions for it to forbear from foreclosing until April 2002. One such condition was that Hayman grant a valid first lien on the sweet potato crop, including the crop grown on Mrs. Boyte's 35 acres, and that Hayman cause Mrs. Boyte to subordinate her interest in the crop to PCA and execute a non-disturbance agreement in favor of PCA.
In the third letter dated June 22, 2001, Hayman informed PCA that it could obtain a valid first lien on 88 acres but that Mrs. Boyte had a first lien on the crop on her acreage due to her "monetary inputs" and the rental under the lease. The letter suggested that Mrs. Boyte would relinquish her first lien position and grant a non-disturbance agreement if PCA reimbursed her input costs.
In its ruling, the trial court found that Mrs. Boyte was a third party beneficiary to the agreement. Finding the agreement ambiguous as to the parties' intent and interpreting it against PCA, the drafter of the agreement, the court concluded that PCA's acknowledgment of Boyte's first lien was not limited to one-fourth of the crop proceeds as rental. Rather, it included her input costs. The trial court also referred to promissory estoppel, unjust enrichment, and detrimental reliance as additional grounds for recovery by Boyte. The trial court rendered judgment in favor of Boyte awarding her reimbursement of input costs in the amount of $12,987.
On appeal, PCA argues that while the trial court was correct in finding the agreement ambiguous, it erred in construing Paragraph 9 against PCA when there was the uncontradicted testimony of Leotis Hyde as to its meaning. PCA also argues that Boyte cannot recover as a third party beneficiary. PCA contends there was no manifestly clear intent to stipulate a third-party benefit, there was no relationship between itself and Boyte to form consideration for such an agreement, and any benefit to Boyte was merely incidental to the Forbearance Agreement. Finally, PCA argues that Boyte cannot recover under the other theories referred to by the trial court in its ruling.

DISCUSSION
Although Mrs. Boyte loaned money to Hayman as input costs for the crop planted on her 35 acres, the record shows that she does not hold a perfected security interest. Therefore, recovery of the input costs depends upon the meaning of Paragraph 9 of the Forbearance Agreement between PCA and Hayman.

Stipulation Pour Autrui
As explained in Stadtlander v. Ryan's Family Steakhouses, 34,384 (La. App.2d Cir.2001), 794 So.2d 881, 886-887, writ denied, XXXX-XXXX (La.6/22/01), 794 So.2d 790:
A contracting party may stipulate a benefit for a third person, who is called a third-party beneficiary. La. C.C. art. 1978. Under Louisiana law, such a contract *769 for the benefit of a third party is referred to as a stipulation pour autrui. A stipulation pour autrui is never presumed. Rather, the intent of the contracting parties to stipulate a benefit in favor of a third party must be made manifestly clear. Additionally, to establish a stipulation pour autrui, the third-party relationship must form the consideration for a condition of the contract, and the benefit may not be merely incidental to the contract. The party demanding performance of an obligation pursuant to a stipulation pour autrui bears the burden of proving the existence of this obligation.
[Citations omitted.]
The Forbearance Agreement between PCA and Hayman included the following language:
9. Debtors shall grant the Association [PCA] a first lien on the 2001 sweet potato crop. The Association acknowledges that Mrs. Boyte holds a first lien on 35 acres of the sweet potatoes planted on Mrs. Boyte's property. The Association will execute a non-disturbance agreement in favor of Mrs. Boyte for the 2001 sweet potato crop up to the amount of Mrs. Boyte's input costs, projected by the Debtors to be $27,926.66.
The agreement sets forth the terms and conditions under which PCA agreed to extend Hayman's indebtedness. The language quoted above is listed among those conditions which formed the consideration for the agreement. Paragraph 15 clearly states that PCA's agreement to extend Hayman's indebtedness is made "(I)n consideration of the above" listed provisions.
Mrs. Boyte's relationship to Hayman as family and as a creditor, as well as her relationship to PCA as a competing creditor with interest in part of the sweet potato crop, was consideration for the condition quoted above. Addressing Mrs. Boyte's rights and position as one of Hayman's creditors was integral to the agreement between Hayman and PCA as was addressing the respective rights between PCA and Hayman's other creditors. For instance, the agreement states in Paragraphs 6 and 10 that in exchange for Hayman granting PCA a first lien on certain equipment, PCA will pay those creditors certain proceeds as detailed in the agreement and Hayman shall cause those creditors to execute a non-disturbance agreement for the 2001 crop year. It is clear that in order for PCA to delay foreclosure and extend Hayman's indebtedness, it had to determine what its relationship and rights would be with respect to Hayman's other creditors, including Mrs. Boyte. The negotiation letters submitted into evidence establish that determining the respective rights of Mrs. Boyte and PCA as to the 2001 sweet potato crop was integral, not merely incidental, to the Forbearance Agreement. It is manifestly clear from the language of Paragraph 9 and the circumstances surrounding the agreement that PCA and Hayman intended to stipulate a benefit in favor of Mrs. Boyte.
Even if we accepted PCA's claim that Paragraph 9 was to apply only in the event of foreclosure, the provision would still be construed as a stipulation pour autrui in favor of Mrs. Boyte for recovery of her input costs at foreclosure. However, neither the clear language of the stipulation, the circumstances surrounding the agreement, nor the record supports PCA's interpretation. The stipulation is clearly for the protection of Mrs. Boyte's input costs, as testified to by Mr. Hyde. However, nothing in the provision limits its application to the event of foreclosure by PCA. As Mr. Hyde testified, such language could have been included but was not. We find no merit in PCA's argument that Paragraph 9 was intended to apply only in the *770 event of foreclosure. The purpose of the agreement was to avoid foreclosure at least until April 1, 2002, by which time Boyte should have received her share from the crop proceeds as reimbursement of the input costs.
Additionally, though Mr. Hyde consistently testified that the language pertinent to Mrs. Boyte, particularly the reference to PCA executing a non-disturbance agreement, was to apply only in the event of foreclosure, his interpretation of that language and his explanation of the non-disturbance agreement provision was contradicted by his own testimony in explaining why PCA wanted a non-disturbance agreement from the Federal Land Bank, another creditor. Hyde testified that PCA was requesting a non-disturbance agreement from the Federal Land Bank, which apparently held a mortgage interest in Hayman's land, so that it would subordinate its interest in to PCA. Presumably, upon execution of the non-disturbance agreement, the Federal Land Bank would not assert its superior lien position to PCA's detriment thereby allowing PCA to obtain the proceeds of the crop sale.
In light of Hyde's explanation of why PCA wanted a non-disturbance agreement from the Federal Land Bank, we find that PCA's assertion in the Forbearance Agreement that it would execute a non-disturbance agreement in favor of Mrs. Boyte for the 2001 sweet potato crop up to the amount of her input costs meant that PCA would not use its superior UCC lien position to the detriment of the "first lien" that it stipulated in her favor. Rather, whether PCA foreclosed or not, it agreed to subordinate its interest in the crop proceeds to Mrs. Boyte's "first lien" up to the amount of her input costs. The acknowledgment of Boyte's "first lien" did not create an actual security interest superior to PCA's, but it did create an obligation on the part of PCA to subordinate its interest in the crop to Mrs. Boyte for recovery of her input costs. As beneficiary of the stipulation pour autrui, Mrs. Boyte may now recover her input costs directly from PCA as ordered by the trial court.
Considering our findings regarding the stipulation pour autrui, the other issues raised on appeal will not be addressed.

CONCLUSION
For the reasons stated we affirm the judgment of the trial court. Costs of appeal are assessed to appellant, PCA.
AFFIRMED.